ORDER AND JUDGMENT*
NEIL M. GORSUCH, Circuit Judge.
One evening in August 2006, Boulder County detectives spotted Ryan Wilson near an area known to be used for the illegal cultivation of marijuana. As they approached, Mr. Wilson admitted the plants were his. But then he took off running, leading officers on a foot chase through three-quarters of a mile of rough terrain, including over a barbed-wire fence.
The detectives called for help. Among those who responded was Officer John Harris. After hearing about the progress of the foot pursuit over his radio, Officer Harris saw Mr. Wilson running across an open field. The officer drove into the field — siren and lights blaring — trying to cut off Mr. Wilson. But Mr. Wilson didn’t stop. So Officer Harris jumped out and joined the chase. In doing so, Officer Harris identified himself as a police officer and commanded Mr. Wilson to halt. Seeing Mr. Wilson reach for his right pocket and fearing a weapon might be hidden there, Officer Harris repeatedly told Mr. Wilson to get his hand away from his pocket. None of this persuaded Mr. Wilson. He ran on until he approached another fence. Only at that point did he slow down, briefly turn toward Officer Harris, and again reach for his right pocket. Mr. Wilson then may have quickly turned away, as if to run once more.
At about that moment Officer Harris fired his taser. A taser works by sending an electric current between the two probes to cause a loss of muscle control. One of the taser’s two probes hit Mr. Wilson’s left side; while there is some dispute where the second probe hit, some evidence suggests it may have struck Mr. Wilson either in the neck or head. Construing the evidence most favorably to the Wilsons, we assume the second probe struck Mr. Wilson’s head. Once hit by the taser, Mr. Wilson fell to the ground, immobilized. When the officers approached, they found a box cutter in the right pocket where he had been reaching, but they also quickly noticed Mr. Wilson was unresponsive. Many attempts were made to revive him but without success. It seems Mr. Wilson died of cardiac arrythmia, with the respective roles played by possible contributing causes (the taser, a pre-existing heart condition, and extreme exertion) much in dispute.
After Mr. Wilson’s tragic death, his parents brought suit. Initially, they pursued various theories against various defendants. Now on appeal, however, they limit their effort to one claim against one defendant, arguing Officer Harris violated 42 U.S.C. § 1988 by using excessive force against their son in defiance of the Fourth Amendment. For its part, the district court' granted summary judgment to Officer Harris, holding him entitled to qualified immunity. The Wilsons disagree with that judgment and ask us to reverse.
This court assesses the question of qualified immunity de novo. Martinez v. Carr, 479 F.3d 1292, 1294 (10th Cir.2007). Once qualified immunity is asserted by a defendant law enforcement officer, however, the plaintiff bears the “heavy two-part burden” of showing both that (1) the defendant violated a constitutional right, and (2) the “infringed right at issue was clearly *777 established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal.” Id. at 1294-95. In this case, we cannot help but agree with the district court that the Wilsons falter on at least their second burden — they have not shown a reasonable officer in Officer Harris’s shoes would have realized his actions amounted to excessive force in violation of the Fourth Amendment.
To demonstrate the infringement of a clearly established right, a plaintiff must direct this court “to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits.” Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir.2008). This isn’t to say a plaintiff must always identify a case on point. Sometimes even a “general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question.” Anderson v. Blake, 469 F.3d 910, 914 (10th Cir.2006). As the district court rightly recognized, our qualified immunity analysis involves something of a “sliding scale”: “[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.” Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir.2007). In all events, however, it remains necessary for the plaintiff to demonstrate that “every reasonable official would have understood that what he” did violated the law. Ashcroft v. al-Kidd, —U.S.-, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).
Turning first to the published cases from this and other circuits and the Supreme Court, none would have clearly alerted a reasonable officer in August 2006 that the conduct at issue in this case amounted to constitutionally excessive force. To the contrary, as the Sixth Circuit held after conducting an exhaustive survey of relevant cases from across the country, “prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them ... were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody.” Hagans v. Franklin Cnty. Sheriff’s Office, 695 F.3d 505, 511 (6th Cir.2012). This class of cases undoubtedly embraces ours: Mr. Wilson was resisting arrest by fleeing from officers after they identified themselves — even if the crime of which he was suspected was not itself a violent one, he was likely to be apprehended eventually, and he hadn’t harmed anyone yet.
The Wilsons and the dissent apparently disagree with the Sixth Circuit’s careful and extensive analysis of existing law, but they fail to directly confront that analysis or the legion cases the court discussed in the course of arriving at its conclusion. Instead, they point to just a few favored cases that, they say, suggest the excessiveness of the force Officer Harris employed. The difficulty is that, even among these selectively picked cases, virtually all were decided after 2006 and so by definition cannot prove the force employed was clearly unlawful as of 2006. See, e.g., Ca-vanaugh v. Woods Cross City, 625 F.3d 661 (10th Cir.2010); Orem v. Rephann, 523 F.3d 442 (4th Cir.2008); Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007). But see Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328 (11th Cir.1988).
Even if we were able to overlook that dispositive problem another would quickly emerge: even on their own terms none of the principal cases on which the Wilsons and the dissent rely actually helps their *778 cause. Instead, the cases tend to lack at least one of two salient features present in this one: fleeing or an investigating officer’s reasonable concern that the suspect possessed something that could and might well be used as a weapon against him. In Cavanaugh, for example, the court allowed a claim for excessive force but the plaintiff there hadn’t attempted to evade law enforcement and quite clearly didn’t possess any weapon. 625 F.3d at 665-66. In Casey, we found excessive force only after the police tackled, tasered, and knocked to the ground a man peacefully attempting to return a file he had unlawfully taken from a courthouse. There was no felony (only a misdemeanor), no fleeing, no weapon, no refusal to obey police commands. 509 F.3d at 1279-80, 1284-85. There was no risk of flight or a potential weapon in Orem either. 523 F.3d at 444-45 (4th Cir.2008). And in Samples, it was disputed whether the plaintiff was fleeing and the force employed (six revolver shots) was undoubtedly deadly. 846 F.2d at 1331-33. In our case by contrast, there is no dispute Mr. Wilson was fleeing or that his actions in reaching for his pocket, especially after being warned not to do so, could lead a reasonable officer to worry he might have a lethal weapon and was prepared to use it. Whether the tasing in our case amounted to the use of “deadly force” subject to heightened scrutiny, moreover, the law did not say in 2006, nor do the Wilsons suggest otherwise. Given all this, we cannot say the case law the Wilsons cite, even if it predated the incident at issue, would go so far as to clearly establish a Fourth Amendment violation in this case.
Were we to slide down the scale further still, away from cases altogether and toward more general constitutional principles, we would still be unable to say Officer Harris should have known his conduct was constitutionally excessive. In assessing Fourth Amendment excessive force claims we look to the totality of the circumstances and, in doing so, three considerations are often in play: “[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In this case, the application of these so-called Graham factors and looking to the totality of the circumstances provides no more clarity to the situation.
Looking to Graham’s first consideration, the illegal processing and manufacturing of marijuana may not be inherently violent crimes but, outside the medical marijuana context, they were felonies under Colorado law at the time of the incident. Colo.Rev. Stat. Ann. § 18-18-406(6)(a); id. at § 18-18-406(7.5). And Officer Harris testified, without rebuttal, that he had been trained that people who grow marijuana illegally tend to be armed and ready to use force to protect themselves and their unlawful investments.
On the second factor, no one questions that the use of a taser, especially if one probe hits the head, amounts to a significant physical intrusion requiring a correspondingly significant justification. When a probe strikes the head, “the nature and quality of the intrusion” is undoubtedly more severe than a probe that doesn’t strike the head, requiring a heightened showing of “countervailing governmental interests” to justify the intrusion. Graham, 490 U.S. at 396, 109 S.Ct. 1865 (quotation marks omitted). But the record does not show precisely how dangerous a taser is in these circumstances, though everyone seems to assume it is less lethal than a gunshot and, again, the Wilsons do not contend it amounts to deadly force. *779 Meanwhile, the facts show that there were significant countervailing governmental interests, that Officer Harris confronted a substantial threat to his safety: he faced Mr. Wilson without fellow officers close enough to offer immediate help; Mr. Wilson disregarded repeated orders to stop; as he confronted a second obstacle to his flight, Mr. Wilson reached toward his pocket despite commands not to do so; Officer Harris could have learned the true nature of what Mr. Wilson had in his pocket only after it was drawn against him; and even box cutters, we know, can be dangerous. The situation at the time the officer fired his taser was, thus, replete with uncertainty and a reasonable officer in his shoes could have worried he faced imminent danger from a lethal weapon. In similar circumstances this court has said that “[ijf an officer reasonably, but mistakenly, believed that a suspect was likely to fight back ... the officer would be justified in using more force than in fact was needed.... A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions.” Estate of Larsen ex. rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir.2008) (alterations omitted) (internal quotation marks omitted). We are not at liberty to hold otherwise now.
On the third Graham factor, there is no question Mr. Wilson actively resisted arrest by running over three-quarters of a mile from the officers, jumping over a barbed-wire fence, and failing to stop despite repeated commands. To be sure, at the moment of confrontation Mr. Wilson approached another fence and hesitated. Given this, it is possible the fence would have cut short his attempt to flee. But, for all Officer Harris knew, Mr. Wilson was considering an escalation of his resis-tence by introducing the use of force when, faced with a second obstacle, he chose to reach for his pocket despite warnings not to do so.
Looking to the circumstances as a whole, then, the Graham factors prove indeterminate at best. One might argue that, on balance, they favor Officer Harris. One might, perhaps with more difficulty, argue they tip in the Wilsons’ favor. But however viewed they do not clearly indicate Officer Harris’s conduct was unlawful. And to know that much is to know we must grant qualified immunity. Maybe the force Officer Harris used was excessive relative to the threat it turned out he faced, as the Wilsons and dissent argue. But that is not enough to warrant damages. To win damages, the Wilsons must show the force the officer used under the rapidly evolving circumstances he faced was clearly excessive as of 2006. And this the Wilsons fail to do: they identify no authority or general legal principle suggesting the use of the taser in this case was clearly excessive in light of Officer Harris’s legitimate self-defense interest.
At qualified immunity’s second step, Graham cautions us to proceed “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,” taking account of “the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving.” 490 U.S. at 396-97, 109 S.Ct. 1865. That admonition seems as if it were intended for this deeply saddening case. With the perspective of hindsight one can easily imagine ways in which this tragedy might have been averted, and no doubt everyone wishes it had been. But the events happened as they did and they happened under highly tense, uncertain, and rapidly evolving circumstances without any clear direction in the law that might have warned Officer Harris his conduct was unlawful. Id.
*780 Without case law to support their cause or any clear lesson to be drawn from the Graham factors, the Wilsons and dissent seek to make much of the fact that Officer Harris “intentionally” or at least “recklessly” aimed the taser at Mr. Wilson’s “head.” See Dissent at 785, 786, 787-88. But under long settled Fourth Amendment law, our analysis may not be informed by the officer’s subjective intent or motives in deploying that force. Instead, our analysis must focus (as it has) on the question whether the officer’s actions were “ ‘objectively reasonable’ in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation.” Graham, 490 U.S. at 397, 109 S.Ct. 1865. In undertaking this assessment, in asking about the objective reasonableness of the force used, we must and do view the facts from the “perspective of a reasonable officer on the scene,” not from the subjective perspective of the officer involved. Id. at 396, 109 S.Ct. 1865; Tanberg v. Sholtis, 401 F.3d 1151, 1168 (10th Cir.2005) (“Under this objective standard, evidence tending to show Officer Sholtis’s subjective state of mind is irrelevant.”). That is the direction the Supreme Court and our precedents give us and which we must and do follow.
Neither are the inferences the Wilsons and the dissent would have us draw about the officer’s state of mind only legally irrelevant: they are also not entirely obvious. Even assuming the officer did strike Mr. Wilson’s head, as we do, we cannot be sure he did so “intentionally” or “recklessly.” The only direct evidence we have on that score comes from Officer Harris who expressly disclaimed any such state of mind, saying that he aimed for Mr. Wilson’s body, not his head. Of course that testimony is self-serving, but it seems to bear corroboration in other facts found by the district court, including the fact the two men were running “headlong” through rough terrain as they approached the second fence; they were “about 15 feet” away from each other at the time; and events unfolded extremely rapidly as Mr. Wilson approached the second fence. See D.Ct. Op. at 12-13. Neither do we have any evidence about the taser’s record of accuracy, let alone under such dynamic and unstable circumstances. Cf. Forrest v. Prine, 620 F.3d 739, 746 (7th Cir.2010) (“No reasonable jury could believe that a police officer, although trained in the use of tasers, always hits precisely his target when the target is moving.”). Given all this, we simply cannot share the dissent and Wilsons’ confidence that the officer’s testimony is worthy of no credence and he “ ‘intentionally’ shot Wilson in the head in the same way [he] ‘intentionally’ [chose] to use a taser to stop the defendant instead of tackling him.” Dissent at 787.
We sympathize with the Wilsons over their terrible loss. But the Supreme Court has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except “the plainly incompetent or those who knowingly violate the law,” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), in order that officers might not be unduly “inhibit[ed] ... in performing their official duties,” Medina v. Cram, 252 F.3d 1124, 1127 (10th Cir.2001). Given the direction we have from the Supreme Court and this court’s precedent, and in light of the state of the law as of 2006, we cannot say the district court erred in its decision to grant qualified immunity.
Having reached that conclusion, we have no need to address Officer Harris’s alternative argument for affirmance — namely, that Wendy Wilson lacked authority to pursue this case because she is not the personal representative of her son’s estate. The dissent takes up the issue and sug *781 gests that Berry v. City of Muskogee, 900 F.2d 1489 (10th Cir.1990), bars pursuit of any state survival or wrongful death cause of action through § 1988. But as Ms. Wilson argues, one could read Berry very differently, as holding merely that Oklahoma’s survival and wrongful death statutes shouldn’t be borrowed. See Berry, 900 F.2d at 1504, 1506 (specifically discussing the deficiencies of Oklahoma’s survival and wrongful death actions). Who is correct we have no need to decide in this case. Likewise, given our ruling on qualified immunity we have no need to reach the Wilsons’ evidentiary appeal contesting the district court’s decision to restrict the scope of their proffered causation expert’s testimony at trial.
The judgment of the district court is affirmed.

 This order is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.