FILED
United States Court of Appeals
Tenth Circuit

November 8, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

BRANDON BLACKMON,

      Plaintiff-Appellee,

v.

MARLA SUTTON, NATASHA TYSON,
KEITH GUTIERREZ, JOHN HITTLE,
KIRK TAYLOR, and JOAN
FITZJARRALD,

      Defendants-Appellants.

No. 12-3199

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:05-CV-01029-MLB)

Edward L. Keeley of McDonald, Tinker, Skaer, Quinn & Herrington, P.A.,
Wichita, Kansas, for Defendants-Appellants.

J. Philip Davidson of Hinkle Law Firm LLC, Wichita, Kansas (Paul J. Skolaut of
Hinkle Law Firm LLC, Wichita, Kansas; Michael Jilka of Law Office of Michael
Jilka, LLC, Lawrence, Kansas; and Timothy J. Finnerty of Wallace, Saunders,
Austin, Brown & Enochs, Chrtd., Wichita, Kansas, with him on the brief) for
Plaintiff-Appellee.

Before **GORSUCH**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Weeks before eleven-year-old, 4'11," 96-pound Brandon Blackmon arrived at the juvenile detention center in Sedgwick, Kansas, officials there made a new purchase: the Pro-Straint Restraining Chair, Violent Prisoner Chair Model RC-1200LX. The chair bore wrist, waist, chest, and ankle restraints all. In the months that followed, the staff made liberal use of their new acquisition on the center's youngest and smallest charge. Sometimes in a legitimate effort to thwart his attempts at suicide and self-harm. But sometimes, it seems, only to punish him. And that's the nub of this lawsuit.

Now an adult, Mr. Blackmon has brought suit under 42 U.S.C. § 1983 against various members of the juvenile detention center's staff, alleging they violated the Fourteenth Amendment rights guaranteed to him as a pretrial detainee. His claims focus primarily on their regular resort to the Pro-Straint chair, but he also contends they used other unlawful punishments, deprived him of essential medical attention, and should have transferred him to another facility. At summary judgment in the district court the defendants claimed qualified immunity and sought dismissal as a matter of law. The district court, however, declined the request and set the case for trial. At least when the facts are viewed in the light most favorable to Mr. Blackmon, the district court explained, they suggest the defendants sometimes exceeded the scope of the qualified immunity they enjoy. In this interlocutory appeal, the defendants ask us to reverse the district court's decision.

This we find we cannot do. True, qualified immunity is strong stuff: the defense shields public officials from suit as long as their conduct didn't infringe any legal rights clearly established at the time. *See Camretta v. Greene*, 131 S. Ct. 2020 (2011); *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). But even accounting for this, we find the results the district court reached correct in all but one particular.[1]

\* \* \*

The jurisprudential terrain between arrest and conviction remains today only partially charted. Over the last several decades, the Supreme Court has elaborated in considerable detail the standards of care prison administrators must satisfy to avoid inflicting "cruel and unusual" punishment on convicted prisoners in violation of the Eighth Amendment. *E.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994). The Court has, as well, expounded on what force officers may and may not use to effect an arrest

---

[1] Mr. Blackmon suggests we might dismiss this appeal for lack of jurisdiction rather than reject it on the merits. But while the Supreme Court's competing instructions about the nature and limits of our authority to entertain interlocutory qualified immunity appeals at summary judgment may be difficult to "reconcil[e]," *Lewis v. Tripp*, 604 F.3d 1221, 1226 n.2 (10th Cir. 2010); *see also Romo v. Largen*, 723 F.3d 670 (6th Cir. 2013), this much is clear: In this case the defendants do not dispute any question of fact — for purposes of this appeal they accept as true Mr. Blackmon's version of the facts and those the district court held a jury could infer in his favor. Instead, the defendants contest only whether, even on this set of facts, they are entitled to immunity as a matter of law. And that's a question we have the authority to consider. *See Garrett v. Stratman*, 254 F.3d 946, 952-53 (10th Cir. 2001).

consistent with the Fourth Amendment and its prohibition of "unreasonable searches and seizures." *E.g.*, *Graham v. Connor*, 490 U.S. 386 (1989). But at least so far the Court has done comparatively little to clarify the standards of care due to those who find themselves between these stools — held by the government after arrest but before conviction at trial. *See* Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. Pa. L. Rev. 1009 (2013).

We know that after the Fourth Amendment leaves off and before the Eighth Amendment picks up, the Fourteenth Amendment's due process guarantee offers detainees some protection while they remain in the government's custody awaiting trial. *See Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979). But we do not know where exactly the Fourth Amendment's protections against unreasonable searches and seizures end and the Fourteenth Amendment's due process detainee protections begin. Is it immediately after arrest? Or does the Fourth Amendment continue to apply, say, until arraignment? Neither do we know with certainty whether a single standard of care applies to all pretrial detainees — or whether different standards apply depending where the detainee stands in his progress through the criminal justice system. Might, for example, the accused enjoy more due process protection before a probable cause hearing than after? All these questions remain very much in play. *See* Struve, *supra*, at 1018-32.

The defendants make much of these lingering questions, going so far as to suggest they preclude the possibility they could have violated the clearly

established legal right of any pretrial detainee in 1997, the time of the events in question in this lawsuit. But that argument proves a good deal too much. In the defendants' world, officials who engaged in sadistic and malicious conduct in 1997 would have violated the defined rights of convicted inmates, but the same conduct would not have violated the rights of pretrial detainees because of the comparative ambiguity surrounding their rights.

Though the law of pretrial detention may not have been precise in all its particulars in 1997, though it may remain comparatively ambiguous today, things have never been quite as topsy turvy as that. Pretrial detainees are not men without countries, persons without *any* clearly defined legal rights. By 1997, it was beyond debate that a pretrial detainee enjoys *at least* the same constitutional protections as a convicted criminal. *Bell*, 441 U.S. at 545. Conduct that violates the clearly established rights of convicts necessarily violates the clearly established rights of pretrial detainees. By 1997, it was clearly established as well that prison officials run afoul of the Eighth Amendment's prohibition of cruel and unusual punishments when they exhibit "deliberate indifference" to a convicted inmate's "serious medical needs." *Estelle*, 429 U.S. at 104. It was clearly established, too, that *Estelle*'s standard gives way to a more onerous test when "guards use force to keep order." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). In deference to the need to maintain order in a prison environment, liability will not attach in these particular circumstances unless the challenged

- 5 -

force is "applied . . . maliciously and sadistically for the very purpose of causing harm." *Id.* at 6.

Neither is this the end to what we know with certainty about the state of the law in 1997 regarding pretrial detainees. By then the Supreme Court had held that the Fourteenth Amendment's guarantee of due process prohibits *any* punishment of those awaiting trial. Punishment may be constitutionally acceptable for persons convicted of crimes — at least so long as it doesn't amount to "cruel and unusual" punishment as defined by *Estelle* and *Hudson*. But punishment is *never* constitutionally permissible for presumptively innocent individuals awaiting trial. *Bell*, 441 U.S. at 535; *see also Youngberg v. Romeo*, 457 U.S. 307, 320-21 (1982).

Where exactly do we draw the line between what does and doesn't constitute "punishment"? Historically, the government has enjoyed the authority to detain until trial those defendants who pose a flight risk. And no doubt those who find themselves detained in this manner experience a great many restrictions on their liberty — restrictions many of us would regard as punishment in themselves. But when do these restrictions pass, as a matter of law, from constitutionally acceptable to constitutionally impermissible?

*Bell* tells us the answer turns on the answers to two questions. First, we must ask whether an "expressed intent to punish on the part of detention facility officials" exists. 441 U.S. at 538. If so, liability may attach. If not, a plaintiff

may still prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective. *Id.* at 539. So, for example, the government may have a legitimate (nonpunitive) interest in ensuring a defendant's presence at trial and may (reasonably) keep him in custody pending trial if he proves a flight risk. Likewise, the government may have a legitimate interest in ensuring the safety and order of the facilities where it houses pretrial detainees. Restraints bearing a reasonable relationship to interests like these do not constitute punishment "even if they are discomforting." *Id.* at 540. At the same time, throwing a detainee in a dungeon and keeping him shackled there "may ensure his presence at trial and preserve the security of the institution," but "it would be difficult to conceive of a situation where conditions so harsh" would be reasonably related to any purpose except punishment. *Id.* at 539 n.20; *see also Schall v. Martin*, 467 U.S. 253, 269 (1984).

\* \* \*

With these (clearly established) legal principles in hand, we can now turn to Mr. Blackmon's primary complaint: the many hours he spent shackled to the Pro-Straint chair. The district court analyzed his claim under *Hudson*'s demanding Eighth Amendment "malicious and sadistic" test for cruel and unusual punishments — and, even then, it found that Mr. Blackmon succeeded in stating a triable claim. We don't need to travel so far, however, to reach the same

destination. While *Hudson* forbids a certain class of punishments for convicted prisoners (cruel and unusual ones), *Bell* forbids punishment altogether for pretrial detainees like Mr. Blackmon. And there is ample evidence in this case that the defendants at least sometimes used the Pro-Straint chair to punish their young charge.

To be very clear, we do not doubt that the defendants often had a legitimate (nonpunitive) purpose for using the chair, or that its use was often reasonably related to that purpose. While awaiting trial — on charges of rape that were eventually thrown out — Mr. Blackmon was deeply distraught. The eleven-year-old attempted suicide and repeatedly banged his head dangerously against walls. No one disputes that the defendants had a legitimate interest in restraining him from these attempts at self-harm. Neither do we understand Mr. Blackmon to suggest that the use of restraints like the Pro-Straint chair is never a reasonable way to achieve this legitimate purpose. Indeed, we are confident Mr. Blackmon remains alive today thanks to the intervention of facility staff and they are due no small measure of credit for that.

The problem is that the factual record in this case points in more than one direction. Much of it suggests that the defendants usually used the restraint chair in a reasonable effort to prevent Mr. Blackmon from killing or seriously injuring himself. But viewing the record in the light most favorable to Mr. Blackmon as we must, it *also* suggests the defendants *sometimes* shackled him with the express

purpose of punishing him, in clear violation of *Bell*'s first test. At least one defendant allegedly instructed others — openly — to use the chair as "punishment." The record evidence suggests the possibility, too, that on other occasions officials shackled Mr. Blackmon without *any* legitimate penological purpose, in clear violation of *Bell*'s second test. Sometimes, Mr. Blackmon alleges, he was shackled to the chair for long stretches when there was no hint he posed a threat of harming himself or anyone else. Other times, Mr. Blackmon was placed in the chair because of a legitimate threat of self-harm but then arguably kept there for extensive periods after any threat of self-harm had dissipated. On one occasion, too, the boy was stripped out of his clothes and forced to wear a paper gown while restrained in the chair. All of this, says Mr. Blackmon's expert, left him with severe mental health problems. And in *none* of these instances does the record appear to reveal a legitimate penological reason for the defendants' actions.

The district court held that facts like these preclude the entry of qualified immunity at summary judgment and we cannot disagree. By 1997, the defendants were on notice that they could not use restraints with the express purpose of punishing or without *some* legitimate penological purpose in mind. Yet the record here suggests they may have used restraints in both forbidden ways at least some of the time. In fact, as the district court observed, by 1997 this court had already held that the use of force without any "disciplinary rationale" runs afoul

even of the Eighth Amendment's protections for convicted prisoners. *See Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999) (collecting cases predating 1997); *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992); *Sampley v. Ruettgers*, 704 F.2d 491, 495-96 (10th Cir. 1983). Under *Bell* and the Fourteenth Amendment, surely no less could have been said by then for pretrial detainees. *See, e.g.*, *Littlefield v. Deland*, 641 F.2d 729 (10th Cir. 1981) (permitting a *Bell* claim to proceed for reliance on solitary confinement as punishment).[2]

Though unable to grant the defendants the immunity they seek at this time, we don't mean to say Mr. Blackmon is destined to prevail in the end. While they can't contest his version of the facts on summary judgment, the defendants are of course free to do so at trial. And they are free to argue to that on the properly

---

[2] The authorities the defendants cite in their support actually do more to confirm this conclusion than refute it. They point to *Milonas v. Williams*, 691 F.2d 931, 934-36 (10th Cir. 1982). But *Milonas* upheld a district court judgment restraining a juvenile detention center from placing their wards in isolation rooms for long stretches (up to 24 hours) "for any reason other than to contain a [child] who is physically violent." *Id.* at 935. *Milonas* also upheld the district court's injunction against the regular practice of pulling the detainees' hair as punishment for bad behavior. *Id.* at 942. If these practices were clearly out of bounds by 1997, it's hard to see how anyone might think those challenged here were not. The defendants' citation to *Sanders v. Hopkins*, No. 97-3082, 1997 WL 755276 (10th Cir. Dec. 5, 1997), is instructive by its contrast. There an adult detainee challenged a jail rule requiring him to wear restraints whenever he ventured outside his cell. This court upheld the restraint on the ground that the detainee had already proven himself a security threat to other inmates and the restraints were designed to address legitimate safety concerns. Meanwhile, the facts in this case (again) suggest that at least sometimes the defendants restrained Mr. Blackmon without any legitimate purpose at all.

found facts, their actions were, as a matter of law, always reasonably related to protecting Mr. Blackmon from himself — an interest the legitimacy of which no one disputes. *See Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991) ("Once the material facts have been established, by admission, stipulation, or trial, our review of a reasonableness inquiry is *de novo*."). The district court likewise remains free to reconsider its qualified immunity question as the facts are developed and decided. But for now our obligation to view facts in the light most favorable to Mr. Blackmon makes the entry of any final judgment impossible.

* * *

Much the same reasoning and result follow for Mr. Blackmon's separate claim against one of the facility's senior corrections workers, Keith Gutierrez. According to Mr. Blackmon, Mr. Gutierrez approved a decision by one of his subordinates — a fully grown man — to sit on the chest of the eleven-year-old, 96-pound boy without any penological purpose. Before us, Mr. Gutierrez doesn't dispute that he personally approved and endorsed the move, *see Dodds v. Richardson*, 614 F.3d 1185, 1199-1202 (10th Cir. 2010) — only whether it clearly violated Mr. Blackmon's Fourteenth Amendment rights.

Assessing this claim through *Bell*'s lens, the record again makes it impossible for us to grant qualified immunity at this time. In support of his allegation, Mr. Blackmon is prepared to testify that Mr. Gutierrez directed his

- 11 -

staff to sit on his chest not "to separate participants in a fight, for self defense, for defending other staff, to protect other juveniles, to prevent property damage, to prevent escape, or to move a juvenile who failed to comply with a lawful order." *See generally Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010) (noting that the burden is on plaintiff to explain in the first instance why force was unjustified). For his part, Mr. Gutierrez replies only that Mr. Blackmon "refused to do as he was told," but he doesn't offer any other explanation for his actions, let alone dispute Mr. Blackmon's account. For all we can tell given the current state of the record, then, it is possible Mr. Gutierrez asked the eleven-year-old to answer an idle question unrelated to the administration of the detention facility — and when the child refused, Mr. Gutierrez had another staff member sit on his chest simply (only) to punish him, precisely as Mr. Blackmon contends.

Now, to be clear, we don't doubt officers *usually* have a legitimate penological purpose for wanting detainees to do as they're told. We don't even doubt that briefly sitting on a detainee might be reasonably related to that purpose in certain circumstances — such as when the detainee bears a weapon he refuses to release or otherwise poses a grave threat to himself or others. *See Leggett v. George*, No. 94-1358, 1995 WL 265931 (10th Cir. May 8, 1995); *Cooper v. Ellsworth Corr. Work Facility*, No. 93-3102, 1993 WL 308095 (10th Cir. Aug. 11, 1993). The problem is, we lack any evidence suggesting anything like that took place. We have no evidence suggesting what Mr. Blackmon failed to do, no

- 12 -

evidence suggesting what legitimate penological purpose was in play in forcing him to respond, no evidence suggesting why officials thought it reasonable to effect that purpose by having a grown man sit on a 96-pound boy. On the frugal record we have, we (like the district court before us) are again left unable to exclude the possibility that a defendant used force against Mr. Blackmon as punishment. And that is enough to preclude granting qualified immunity at summary judgment under *Bell*'s plain terms.[3]

* * *

Beyond his claims for unconstitutional punishment and the use of excessive force, Mr. Blackmon asserts that two employees at the juvenile detention facility — Joan Fitzjarrald, the mental health unit supervisor, and Kirk Taylor, a counselor who was a member of the facility's mental health team — failed to provide him with any meaningful mental health care despite his obvious need for it. Mr. Blackmon alleges that their failure to do so constituted a separate violation of his Fourteenth Amendment rights.

Both sides ask us to assess this claim under *Estelle*'s deliberate indifference standard. Developed in the Eighth Amendment context and used there to address

---

[3] Mr. Gutierrez insists that *Thompson v. Hamilton*, No. 97-6084, 1997 WL 639320 (10th Cir. Oct. 14, 1997), compels judgment in his favor. But the prison guard in that case acted with an obviously legitimate penological purpose when he grabbed and twisted an adult detainee's arm — the officer was attempting to facilitate the prisoner's safe transfer from his cell. Here, however, we lack enough facts to say so much.

- 13 -

prisoner claims of inadequate medical care, both sides acknowledge that *Estelle* bears its uses in the Fourteenth Amendment context — because, again, detention center officials surely owe pretrial detainees like Mr. Blackmon at least the same standard of care prison officials owe convicted inmates. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999); *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985).

For its part, *Estelle*'s deliberate indifference standard contains both an objective and a subjective component. Objectively, the patient's medical needs must be "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Subjectively, the defendant-official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. This subjective standard lies "somewhere between the poles of negligence at the one end and purpose . . . at the other." *Id.* at 836. The Supreme Court has analogized it to criminal recklessness, to the conscious disregard of a "substantial risk of serious harm." *Id.* at 836-38. The parties agree that by 1997 it was clearly established law that the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs. *See Ramos*, 639 F.2d at 574-75. The question we face, then, is

whether deliberate disregard to Mr. Blackmon's mental health needs can be found in this case, at least when the facts are viewed in the light most favorable to him.

Really, though, the scope of our inquiry is even narrower than that. On the first *Estelle* test, Ms. Fitzjarrald and Mr. Taylor accept for purposes of this appeal that Mr. Blackmon's mental health issues were so obvious that a layperson would've known he required a doctor's attention. When it comes to the second *Estelle* test, Ms. Fitzjarrald and Mr. Taylor do not dispute that they knew Mr. Blackmon faced an excessive risk to his safety. Instead, Ms. Fitzjarrald and Mr. Taylor seem to argue that their conduct didn't disregard a substantial risk of serious harm. It didn't, they say, because they are not licensed mental health professionals and so they could not have provided any mental health care to Mr. Blackmon even if they had wanted to. For his part, Mr. Blackmon argues vociferously that the defendants were legally able to provide and responsible for providing him with mental health care and utterly failed to do so.

Even taking the defendants' self-serving descriptions of their limitations at face value, however, it isn't enough to guarantee them qualified immunity at summary judgment. By 1997 this court had clearly held that the Eighth Amendment is offended not only by medical professionals who fail to treat, but also by prison officials who assume "gate keeping" authority over prisoner access to medical professionals. *Ramos*, 639 F.2d at 575. As long ago as *Estelle*, the Supreme Court stated that one way a prisoner may satisfy the subjective

component of the deliberate indifference test is to show that a "gate keeping" prison official "den[ied] or delay[ed] [him] access to medical care" in conscious disregard of a substantial risk of serious harm. 429 U.S. at 104-05.

Viewing the record in the light most favorable to Mr. Blackmon, one could draw that inference here. Ms. Fitzjarrald and Mr. Taylor don't deny that they were at least the mental health "gate keepers" at the juvenile detention facility. They don't deny that they were well aware of Mr. Blackmon's grave mental health problems, that they were aware those problems grew worse during his stay, or that their routine resort to the Pro-Straint chair wasn't helping. The facts suggest, too, that the pair delayed or denied him access to mental health care by qualified professionals (assuming they are not that). To be sure, the record shows the defendants did consult a psychologist, but it also shows a considerable delay between the onset of Mr. Blackmon's serious suicidal and self-harm problems and the consultation; it shows that no mental health treatment to speak of was provided as a result of the consultation; and it shows that serious suicide and self-harm problems recurred shortly after the consultation, yet the defendants again delayed a long period before seeking assistance.

Long ago, *Estelle* cited favorably *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), a case in which prison staff did provide an inmate with mild antacids in response to a badly bleeding ulcer but failed to provide him with access to obviously needed medical care for what was clearly a life-threatening condition.

- 16 -

The denial of meaningful access to care and the delay in doing so was, the court found, enough to suggest conscious disregard of a substantial risk of serious harm. *Id.* at 860-61; *see also Hathaway v. Coughlin*, 37 F.3d 63, 67-69 (2d Cir. 1994); *Johnson v. Lockhart*, 941 F.2d 705, 706-07 (8th Cir. 1991); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). The record permits a similar sort of inference here. Of course, key facts remain in dispute and nothing we say should be taken as suggesting liability must attach after they are sorted out at trial. It is only to say that Mr. Blackmon has produced enough facts that, if credited, could suggest a violation of clearly established law.[4]

* * *

Finally, Mr. Blackmon asserts a claim against the director of the juvenile detention facility, Marla Sutton, for failing to transfer him to a nearby shelter. Mr. Blackmon had been housed in the shelter before, but officials apparently decided not to send him there this time because he had previously disobeyed the shelter's staff. Also, it seems Mr. Blackmon's placement in an unlocked facility

---

[4] Once again, the authorities the defendants cite do nothing to help their cause. Ms. Fitzjarrald and Mr. Taylor rely heavily on *Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989), and *Riddle v. Mondragon*, 83 F.3d 1197 (10th Cir. 1996). But in those cases the detainees' *objective* need for serious mental health treatment was found unclear. Here, for purposes of this summary judgment motion the defendants themselves don't contest the objective component of the deliberate indifference test. They accept that Mr. Blackmon suffered from a serious mental health illness and that his objective need for treatment would've been obvious to a layperson. So when it comes to speaking to the situation we face, *Edwards* and *Riddle* turn out to be simply mute.

like the shelter posed a flight concern because, once before, he had left the jurisdiction while charges were pending against him and a bench warrant had to issue. Still, Mr. Blackmon argues that Ms. Sutton violated his constitutional rights by failing to transfer him away from the juvenile detention center to the unlocked shelter. For its part, the district court agreed that a triable claim existed here and declined Ms. Sutton's request for qualified immunity. It is on this claim, Mr. Blackmon's self-described "transfer claim," we must part ways with the district court's judgment.

As we've seen, by 1997 it was clear enough that pretrial detainees enjoyed a variety of rights — including the right to be free from punishment and deliberate indifference to their serious medical needs. But it's unclear whether pretrial detainees also enjoyed an independent right to be placed in a particular facility of their choice while awaiting trial, as Mr. Blackmon seems to suppose. We can imagine easily enough situations in which a transfer might be necessary to ensure a pretrial detainee isn't exposed to conditions that amount to unconstitutional punishment, or to ensure he receives constitutionally guaranteed medical treatment. But here Mr. Blackmon doesn't argue any of that. Here he argues that he enjoyed a freestanding constitutional right to be transferred to the unlocked shelter. In doing so, he assumes the obligation to identify clearly established law as of 1997 entitling a pretrial detainee to a right to transfer *as such*. And that he has not done.

Mr. Blackmon does direct us to *Farmer*. That case (again) recognized a prisoner's right to be free from deliberate indifference by prison officials to legitimate needs for food, clothing, shelter, medical care, and the like. 511 U.S. 825. Mr. Blackmon also directs us to *Battle v. Anderson*, 564 F.3d 388 (10th Cir. 1977). That case recognized an inmate's right to adequate sanitation and ventilation, as well as to conditions that aren't gravely overcrowded. *Id.* But neither of these cases recognized anything like a right to transfer *simpliciter*. As a *remedy* for the sorts of constitutional violations discussed in *Farmer* or *Battle*, we don't doubt a prison might have to transfer (or release) prisoners or detainees — or take some other comparably serious action. But nothing in either case suggests prisoners or detainees have a right to transfer to another specific and preferred facility as such. *Cf. Overturf v. Massie*, 385 F.3d 1276, 1279 (10th Cir. 2004) (finding that "inmates have no protected liberty interest in the location of their confinement").

Even if we were to recast Mr. Blackmon's complaint for him, even if we were to try to mold it into an *Estelle/Farmer* challenge to the conditions of his confinement — something Mr. Blackmon himself doesn't attempt — we still don't see how that would add any additional basis for liability beyond those we've already discussed. Those cases require proof that the defendant prison official in question acted (again) with subjective "deliberate indifference" to an objectively "excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

Yet Mr. Blackmon himself acknowledges that his placement in the juvenile detention center didn't alone, by and of itself, constitute an objectively excessive risk to his health or safety. In his view, the risk to his health and safety arose from Ms. Sutton's "fail[ure] to remove [him] from the unsafe environment *or take other measures to protect [him] from the excessive use of force at JDF [viz., the juvenile detention facility]*." Appellee's Br. at 33 (emphasis added). According even to Mr. Blackmon, then, a transfer to the shelter was *not* necessary to avoid any excessive risk to his health and safety. Appropriate measures could have been taken to ensure his health and safety in the juvenile detention facility where he was housed. Indeed, the rest of Mr. Blackmon's suit seems to prove the point. If officials at the detention center hadn't used excessive force, if they had done more to address his mental health problems, Mr. Blackmon acknowledges his health and safety could have and would have been ensured. Put simply, Mr. Blackmon alleges no facts from which a reasonable trier of fact could conclude that his placement in the juvenile detention facility automatically and alone amounted to an "objectively excessive risk" to his health and safety.

\* \* \*

The motion to dismiss is denied and the decision of the district court denying qualified immunity is affirmed, except with respect to Mr. Blackmon's "failure to transfer" claim against Ms. Sutton. On that claim, we direct the district court to grant qualified immunity to Ms. Sutton.