**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 2, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CHRISTOPHER COLBRUNO,

     Plaintiff - Appellee,

v.

WILLIAM KESSLER, in his official and
individual capacity; SAMANTHA
KIELAR, in her official and individual
capacity; TINA KLOSIEWSKI, in her
official and individual capacity; RYAN
SEWITSKY, in his individual and official
capacity; THOMAS TINDALL, in his
individual and official capacity; STEPHEN
PETIT, in his individual and official
capacity,

     Defendants - Appellants,

and

CITY AND COUNTY OF DENVER, a
municipality; ELIAS DIGGINS,

     Defendants.

No. 18-1056

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-01072-WYD-MJW)**
_____

Michele A. Horn, Assistant City Attorney, Denver, Colorado (Melanie B. Lewis,
Assistant City Attorney, Denver, Colorado on the briefs) for Defendants-Appellants.

David A. Lane, Killmer, Lane & Newman, LLP, Denver, Colorado for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Christopher Colbruno was in jail awaiting trial when he needed to be taken to the hospital for an urgent medical condition. Six deputies in the Denver Sheriff's Department (Defendants) walked him through the public areas of the hospital completely unclothed except for an orange pair of mittens. Complaining that the deputies violated his constitutional rights, he sued them, among others, under 42 U.S.C. § 1983.[1] Defendants moved to dismiss for failure to state a claim on the ground that they were entitled to qualified immunity. The district court disagreed, and Defendants appealed to this court. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Plaintiff's complaint alleges facts supporting the inference that the public exposure of his naked body was wholly unjustifiable and therefore suffices to state a claim under the Fourteenth Amendment. Whether the evidence supports those allegations is a question for further proceedings.

_____

[1] Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

## I.     BACKGROUND

Although the district court characterized its decision (which addressed a variety of issues in addition to qualified immunity) as resolving motions for summary judgment, it is apparent from the record that the court resolved Defendants' qualified-immunity motion solely on the basis of allegations made in Plaintiff's complaint. We therefore consider this to be an appeal from the denial of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). On review we accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See Doe v. Woodard*, 912 F.3d 1278, 1285 (10th Cir. 2019).

Plaintiff's complaint alleges the following: On May 4, 2015, he was a pretrial detainee in the custody of the Denver Sheriff's Department at the Van Cise-Simonet Detention Center. During an apparent psychotic episode, he swallowed metal components of an emergency call box in his jail cell. After jail officials learned of this at about 10:00 p.m., they contacted a physician at the Denver Health Medical Center and were told that he should be brought to the hospital for x rays and treatment within one hour. At 12:20 a.m., three of the Defendants removed him from his cell and placed him in a van to go to the hospital. On the way there, Plaintiff urinated and defecated on the smock he was wearing. The three transporting Defendants were met at the hospital by the other three Defendants. Defendants removed the smock and walked Plaintiff into the hospital without any clothes on except a pair of orange mittens, passing through the ambulance bay, entrance, atrium, and hallways before chaining him to a bed. Hospital

3

staff witnessed this conduct and reported it to the hospital risk manager because they found it disturbing.

## II.  DISCUSSION

Defendants[2] have asserted the defense of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1026 (10th Cir. 2015) (internal quotation marks omitted). "Because qualified immunity establishes immunity from suit rather than a mere defense to liability, a district court's denial of a claim of qualified immunity is immediately appealable under 28 U.S.C. § 1291." *Id.* (internal quotation marks and citation omitted). But our jurisdiction in such an interlocutory appeal is limited to the legal question of whether the alleged facts state a violation of clearly established law. *See id.*

"In resolving a motion to dismiss based on qualified immunity, the court considers (1) whether the facts that [Plaintiff] has alleged make out a violation of a constitutional

---

[2] "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation," so "we must examine the allegations in the complaint as to each individual appellant to determine whether a plausible claim for relief is stated." *Wilson v. Montano*, 715 F.3d 847, 854 (10th Cir. 2013) (internal quotation marks omitted). But because Plaintiff alleges that all six Defendants participated equally in walking him into the hospital without clothes on, and Defendants make no argument that they are differently situated with regard to liability, we will treat them all the same for purposes of this appeal. *See Estate of Booker v. Gomez*, 745 F.3d 405, 421–22 (10th Cir. 2014). Of course, evidence developed upon remand may make distinctions among them appropriate.

right, and (2) whether the right at issue was clearly established at the time of [Defendants'] alleged misconduct." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (internal quotation marks omitted). The law was "clearly established" if it "was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted); *see id.* at 590 ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (internal quotation marks omitted)). Generally, "[t]he plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Woodard*, 912 F.3d at 1289 (internal quotation marks omitted). "Ultimately, we consider whether our precedents render the [il]legality of the conduct undebatable." *Lowe v. Raemisch*, 864 F.3d 1205, 1211 (10th Cir. 2017). Our review is de novo. *See Keith*, 707 F.3d at 1187.

### A.    Mistreatment of Detainees

Plaintiff asserts that Defendants' treatment of him violated the Fourth Amendment's protection against unreasonable seizures and the Fourteenth Amendment's Due Process Clause. To resolve what constitutional provision governs this case, we need to review the proper scope of the potentially applicable provisions. First, however, we should explain our nomenclature, because almost any federal constitutional claim against state officials is, strictly speaking, a claim under the Fourteenth Amendment. Although the provisions of the Bill of Rights are directed only to the federal government, *see*

*Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 247 (1833), the Supreme Court over the years has incorporated most of those provisions into the Fourteenth Amendment, *see Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("With only a handful of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." (internal quotation marks omitted)). Thus, even when dealing with state officials, it is common to say that a claim is based, say, on the First Amendment, Fourth Amendment, Sixth Amendment, or Eighth Amendment. We follow that practice here to add clarity to our discussion. When we speak of a Fourteenth Amendment claim in this opinion, we will be referring to a claim that is *not* based on incorporating the Bill of Rights into that amendment, but rather is based on the Due Process Clause in itself. We note, however, that courts analyze such claims against state officials essentially the same way as they analyze claims against federal officials under the Due Process Clause of the Fifth Amendment. *See Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007) ("The Due Process Clause of the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Due Process Clause of the Fifth Amendment upon their federal counterparts." (brackets and internal quotation marks omitted)).

The essence of Plaintiff's claim is that he was mistreated while in state custody. Alleged mistreatment of this type may be challenged under the Fourth Amendment, Eighth Amendment, or Fourteenth Amendment. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Even one who has been properly searched or seized by police authorities (say, arrested on probable cause), can

6

claim that the search or seizure was unreasonable because of unreasonable treatment by officers in effecting the search or seizure. Typically, the mistreatment has been the use of excessive force; but "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests—a person's sense of security and individual dignity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001) (internal quotation marks omitted) (abusive conduct of SWAT team while holding residents at gunpoint during execution of search and arrest warrants).

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It applies to those who have been convicted of crime, so they usually cannot complain of confinement itself. *But see Hawkins v. Hargett*, 200 F.3d 1279, 1282 (10th Cir. 1999) (Eighth Amendment protects against sentence that is grossly disproportionate to the offense). It does, however, protect against unjustifiable conditions of confinement, such as "the unnecessary and wanton infliction of pain," *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (internal quotation marks omitted), or deliberate indifference to an excessive risk to a prisoner's health, *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994). When a prisoner challenges a particular use of force by prison officials, the prisoner can establish an unnecessary and wanton infliction of pain by showing that the action was taken "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. We have held that psychological harm, as well as physical injury, can implicate the Eighth Amendment. *See Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001); *see also Hudson*, 503 U.S. at 16 (Blackmun, J., concurring in the

7

judgment) ("It is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment.")

For those in pretrial confinement, such as Plaintiff, claims regarding mistreatment while in custody generally do not come within the protection of the Fourth Amendment or the Eighth Amendment. As explained in *Porro v. Barnes*, 624 F.3d 1322, 1325–26 (10th Cir. 2010) (Gorsuch, J.), "[T]he Fourth Amendment . . . pertains to the events leading up to and including an arrest of a citizen previously at liberty," while the Eighth Amendment is the source of protection for "prisoners already convicted of a crime who claim that their *punishments* involve excessive force." Thus, when a "plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment[,] we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities" to evaluate claims of mistreatment. *Id.* at 1326. That is Plaintiff's situation, so we assess his claim under the Fourteenth Amendment. *See Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982) (assessing under the Fourteenth Amendment a pretrial detainee's claim of unwarranted forced nudity), *abrogated on other grounds* by *Cty. Of Riverside v. McLoughlin*, 500 U.S. 44, 50 (1991).

Although the full scope of protection provided by the Due Process Clauses to pretrial detainees may be to some extent uncertain, the Supreme Court has been categorical in one respect: "[A] detainee may not be *punished* prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)

8

(emphasis added). Thus, in analyzing a condition of pretrial confinement, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id*. (brackets and internal quotation marks omitted). "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. at 539.

We applied those principles to a claim of excessive force in *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013) (Gorsuch, J.). An 11-year-old pretrial detainee claimed that detention-center officials had unconstitutionally punished him by repeatedly placing him in a restraint chair (and in one instance by having a guard sit on his chest) without any legitimate penological purpose. *See id*. at 1242–43. We held that these would be Fourteenth Amendment violations. *See id*. at 1240–44. We explained that a pretrial detainee can establish that official actions constitute unconstitutional punishment either by showing that "an expressed intent to punish on the part of detention facility officials exists," *or* "by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective." *Id.* at 1241.

9

*Bell* and *Blackmon* are not entirely clear about whether a pretrial detainee could sustain a due-process claim for mistreatment without showing that the custodians intended their actions as punishment. Both opinions could be read as requiring an intent to punish the pretrial detainee although allowing such intent to be inferred from the absence of a legitimate purpose behind the offensive conduct. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477–78 (2015) (Scalia, J., dissenting) (discussing *Bell*). But the Supreme Court in *Kingsley* eliminated any ambiguity. Reviewing a claim of excessive force brought by a pretrial detainee, the Court declined to read *Bell* as meaning "that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated." *Id*. at 2473. Rather, a pretrial detainee can establish a due-process violation by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id*. at 2473–74.[3] In particular, there is no subjective element of an excessive-force claim brought by a pretrial detainee. *See id.* at 2476.

### B.     Public Exposure of Nude Body of Detainee

In our view, any reasonable adult in our society would understand that the involuntary exposure of an adult's nude body is a significant imposition on the victim.

---

[3] The dissent argues that the proper approach to Fourteenth Amendment claims against executive action would be to determine whether the action shocks the conscience. *Kingsley*, however, is to the contrary for claims relating to the treatment of pretrial detainees.

And law-enforcement officers in this circuit have been taught this lesson repeatedly. In *Shroff v. Spellman*, 604 F.3d 1179, 1184 (10th Cir. 2010), the plaintiff had been placed in a holding cell after her arrest, awaiting transfer to the city jail. She told the arresting officer that she needed to pump breastmilk to be used by her infant child in her absence. *See id.* He required her to do so under the observation of a female cadet, even though she could have been afforded privacy in a room with a guard outside. *See id.* at 1191. We held that the officer had violated the Fourth Amendment, because he had "not demonstrated any justification for requiring [the plaintiff] to expose her breasts to a female cadet while she performed an essential bodily function in providing milk for her baby." *Id.*; *see May v. City of Nahunta, Geo.*, 846 F.3d 1320, 1331 (11th Cir. 2017) (woman subject to mental-health detention forced to disrobe in presence of male officer); *see also Los Angeles Cty., Cal. v. Rettele*, 550 U.S. 609, 615 (2007) (in holding that officers did not act improperly in executing search warrant, Court notes that officers did not delay detainees from putting on clothes "longer than necessary to protect their safety").

Similarly, in *Hill v. Bogans*, 735 F.2d 391, 393 (10th Cir. 1984), a man arrested on a bench warrant for traffic violations was forced to "drop his pants and undershorts" as part of the booking process in a jail's "lobby area where he observed ten to twelve people in the immediate vicinity." We held that his Fourth Amendment rights had been violated because the search was unnecessary to discover contraband or weapons, and took place in front of multiple people in a public area. *See id.* at 394–95.

11

We have recognized the significance of such an imposition even on prisoners after they have been convicted and are serving time in prison. In *Farmer v. Perrill*, 288 F.3d 1254, 1257 (10th Cir. 2002), a female inmate challenged a prison's alleged policy of requiring a "visual search" of inmates' naked bodies in view of other inmates after trips to the prison yard. We held that she had "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." *Id*. at 1260 (emphasis omitted). It appears, although it is not certain, that our decision in that case relied on the Fourth Amendment; but several other circuits have recognized that officials can violate the Eighth Amendment by forcing inmates to expose their naked bodies for the purpose of humiliation. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Kent v. Johnson*, 821 F.2d 1220, 1227–28 (6th Cir. 1987); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981). And in *Cumbey v. Meachum*, 684 F.2d 712, 713 (10th Cir. 1982), we considered a prisoner's complaint that his constitutional rights had been violated because female prison guards "are assigned to posts where they observe[d] him dressing and undressing and using the toilet and the shower." We held that the complaint was improperly dismissed as frivolous, saying that "[a]lthough the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Id*. at 714. We did not reference any particular provision of the Constitution.

All we need to take from these cases is a conclusion that was obvious without them: exposing a person's naked body involuntarily is a severe invasion of personal privacy. The conclusion that Defendants' alleged conduct constituted a violation of the

12

Fourteenth Amendment readily follows. The only issue is whether the exposure of Plaintiff's body was "not rationally related to a legitimate governmental objective or [was] excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473–74. In our view, the facts alleged in the Complaint satisfy this condition.

Defendants argue that Plaintiff needed medical treatment urgently, and that finding another covering for him before transporting him through the hospital would have taken too much additional time and effort. But Plaintiff has alleged facts supporting the reasonable inference that no vital urgency justified Defendants' actions. His complaint states that Defendants took more than two hours to transport him to the hospital. It also alleges that at the end of his walk through the hospital he was chained to a hospital bed, not immediately x-rayed or provided with treatment. The district court ruled that these allegations were sufficient to support the inference that Plaintiff's condition was not so urgent that Defendants could not have delayed walking him into the hospital for "[t]he additional moment that would have been required to locate and place a smock" on him. District Court Order at 17. We agree with the district court. It is common sense that acquiring some replacement clothing at a hospital would be at most a matter of minutes, and we can reasonably infer from the long delay in transporting Plaintiff that Defendants' actions were not based on a medical need so pressing that they could not spare a little time to obtain a dignified covering.

### C.    Qualified Immunity

There remains the question whether Defendants are entitled to qualified immunity. Was the law clearly established that their conduct (as alleged by Plaintiff) violated the

13

Fourteenth Amendment?  Ordinarily the answer is no unless there is precedent of the Supreme Court or of this court declaring that there would be a violation under closely similar facts.  Fortunately, however, not every constitutional violation has factual antecedents.  We can occasionally rely on the general proposition that it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . even though existing precedent does not address similar circumstances."  *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted); *see Lowe*, 864 F.3d at 1210–11 ("[T]he constitutional violation may be so obvious that similar conduct seldom arises in our cases," and "it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." (internal quotation marks omitted)).  We must be careful not to do so when there are any relevant ambiguities, such as whether physical force is justified for a particular purpose or in a particular context, *see Aldaba v. Pickens*, 844 F.3d 870, 879 (10th Cir. 2016) (use of taser to subdue person needing medical care), or whether force used constituted deadly force, *see Thomson v. Salt Lake County*, 584 F.3d 1304, 1315–17 (10th Cir. 2009) (whether use of police dog constituted deadly force); *Wilson v. City of Lafayette*, 510 F. App'x 775, 778 (10th Cir. 2013) (Gorsuch, J.) (whether tasing amounted to use of deadly force).  Here, however, there are no relevant ambiguities regarding the manner in which Defendants allegedly took Plaintiff from the police vehicle to his hospital room.

The Fourteenth Amendment is violated if a pretrial detainee is subjected to "a restriction or condition . . . not reasonably related to a legitimate goal."  *Bell*, 441 U.S. at

14

539; *see Kingsley*, 135 S. Ct. at 2473–74.  To be sure, some restrictions or conditions may be too insignificant to be the predicate for a Fourteenth Amendment violation.  But common sense tells us that parading someone nude in public is not so insignificant, and the above-referenced Fourth Amendment jurisprudence makes the point crystal clear.  We therefore proceed as we did in *Blackmon*.  As previously noted, that case involved a juvenile pretrial detainee.  The evidence supported the inference that on occasion the plaintiff had been shackled to a restraint chair "for long stretches when there was no hint he posed a threat of harming himself or anyone else."  *Blackmon*, 734 F.3d at 1242.  Further, on one occasion he "was stripped out of his clothes and forced to wear a paper gown while restrained in the chair," *id*., and on another a corrections worker sat on him "without any penological purpose," *id*. at 1243.  Even in the absence of any precedential opinions holding that there had been a Fourteenth Amendment violation under similar facts, we denied qualified immunity, saying:  "On the frugal record we have, we (like the district court before us) are again left unable to exclude the possibility that a defendant used force against Mr. Blackmon as punishment.  And that is enough to preclude granting qualified immunity at summary judgment under *Bell*'s plain terms."  *Id*. at 1244.  *Bell* in itself sufficed as clearly established law in that context.  There is little subtlety in a standard requiring merely a rational relationship to a legitimate objective.  In our view, *Bell* suffices here as well, particularly given the additional precedential authority of *Blackmon*.

On one possible aspect of Plaintiff's claim, however, we do not think Defendants' actions were governed by clearly established law.  To the extent that Plaintiff claims that

15

his constitutional rights were violated by being chained in the hospital bed to which he was taken, we dismiss the claim as barred by qualified immunity. Given Plaintiff's status as one facing criminal charges, and the apparent risk he posed to himself, there was certainly a legitimate purpose for the constraints. Also, his nude body was presumably then exposed only to his hospital caregivers, who could best determine what, if any, garb or covering was appropriate for his treatment and care. Given the much more limited nature of Plaintiff's exposure, the legitimate reasons for the restraint, and the change in caretaker upon Plaintiff's delivery to the room, it is not obvious that Defendants denied him due process in the manner that they left him in the hospital bed.

### III.  CONCLUSION

We **AFFIRM** the denial of qualified immunity except to the extent that Plaintiff's claim is based on his treatment after being taken to his hospital room.

18-1056, *Colbruno v. Kessler*
**TYMKOVICH**, Chief Judge, dissenting.

This case presents a classic variation on the theme that "bad facts make bad law." The experiences alleged by Mr. Colbruno, if inflicted with malice, would trouble anyone. If, on the other hand, deputies sought only to make the best of a bad situation in obtaining emergency medical care for him, few would be alarmed.

In my view, Mr. Colbruno has not adequately alleged malicious conduct. Applying the appropriate legal framework under the Fourteenth Amendment, the deputies should therefore be entitled to qualified immunity. As the majority explains, Mr. Colbruno must allege some violation of a clearly established constitutional right. But the complaint fails to allege facts sufficient to state a claim for substantive due process under the Fourteenth Amendment, let alone one that was clearly established at the time of the events in question.

I begin by reiterating the appropriate legal framework for a complaint like this one, which alleges official misconduct. I then contrast this approach with the framework adopted by the majority. Ultimately, I conclude that—when either standard is faithfully applied—Mr. Colbruno has failed to allege a violation that was clearly established.

### A. Fourteenth Amendment Violation

The majority is correct in concluding these allegations are best analyzed under the Fourteenth Amendment's provision for due process. But I believe the majority has applied the wrong due-process framework.

### 1. The Appropriate Framework

The Supreme Court has read the Fourteenth Amendment to authorize challenges to abusive or arbitrary governmental conduct through claims of *substantive due process*. *E.g., Cty. Of Sacramento v. Lewis*, 523 U.S. (1998). Governmental conduct may prove sufficiently abusive or arbitrary so as to violate substantive due process in one of two ways—from (1) legislative acts that infringe upon a personal right without sufficient justification, or (2) official conduct that deprives a person of life, liberty, or property in a manner so arbitrary as to shock the judicial conscience. *E.g., United States v. Salerno*, 481 U.S. 739, 746 (1987) ("'[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'") (citations omitted).

These allegations do not involve legislative action, so they must be evaluated under the cases that consider official conduct. *See Lewis*, 523 U.S. at 846–47; *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015). These cases emphasize that "only the most egregious official conduct can be said to be 'arbitrary' in the constitutional sense." *Onyx Props. LLC v. Bd. of Cty. Commr's of Elbert Cty.*, 838 F.3d 1039, 1048–49 (10th Cir. 2016). In evaluating allegations of official misconduct, we apply the "shocks the conscience" standard.[1]

---

[1] *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1788 (2012) (explaining *Lewis*'s holding "that substantive due process claims against the executive—usually law enforcement officers—are

Conduct "shocks the conscience" when it demonstrates such "a degree of outrageousness and a magnitude of potential or actual harm" that it "shocks the conscience of federal judges." *Uhlrig v. Harder*, 64 F.3d 567, 573–74 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)) (internal quotation marks omitted); *see also Halley v. Huckaby*, 902 F.3d 1136, 1155 (10th Cir. 2018) ("Conduct that shocks the judicial conscience is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.") (quoting *Hernandez v. Ridely*, 734 F.3d 1254, 1261 (10th Cir. 2013)) (internal quotation marks omitted).

This standard is exacting, in large part because the complete universe of state-law torts might otherwise then be distorted into constitutional violations of due process. *Dawson v. Bd. of Cty. Commr's of Jefferson Cty.*, 732 F. App'x 624, 634 (10th Cir. 2018) (Tymkovich, C.J., concurring), *cert denied* — U.S. — , 139 S. Ct. 862 (2019). We have therefore observed that only the most genuinely egregious abuse or misuse of governmental power will be sufficient to clear the burden required to shock the judicial conscience. *E.g., Lindsey v. Hyler*, 918 F.3d 1109, 1116 (10th Cir. 2019).

This complaint cannot clear such a high standard. Mr. Colbruno alleges the deputies moved him from the ambulance bay to his hospital room without clothing or otherwise covering his body. This contention supports an inference of indifference or

governed by a 'shocks the conscience' test").

-3-

callousness, but no more. Mr. Colbruno does not allege any intent to humiliate or punish lay behind this decision. Nor does he contend the deputies prolonged his exposure to potential onlookers, either through needless delay or circuitous travel through the hospital. Nor, lastly, does he allege that anyone beyond hospital personnel witnessed any of these events. All of which presumably transpired within seconds.

In short, as the complaint now stands, we know the deputies were responding to a medical emergency; we know Mr. Colbruno—after ingesting metal objects in the midst of a pyschotic episode—had soiled himself while in transit from pretrial detention to the hospital; and we know the deputies decided to rush him into the emergency room, unclothed. We do not know why they made the decisions they did; we do not know whether a suitable gown was readily available; and we do not know whether time was really of the essence. Perhaps further investigation prior to filing this lawsuit would have shed light upon some of these missing facts. Taken together, the answers to the questions could very well allow for a permissible inference of conscience-shocking conduct.[2]

But in the absence of such additional factual context, I would conclude the complaint fails to allege the requisite inference of malice that is necessary to conclude the deputies might have engaged in conduct that shocks the conscience. In sum, Mr.

---

[2] Mr. Colbruno was likewise obligated to plead specific facts that plausibly allege a constitutional violation *as to each defendant*. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). He did not do so. The complaint alleges only that Officer Petit, as ranking officer, made the decision to remove Mr. Colbruno from the van without a smock.

Colbruno has not adequately alleged a violation of his constitutional rights to substantive

due process under the Fourteenth Amendment.

### 2. The Majority Framework

Given the limitations of the complaint, the majority acknowledges difficulty in

identifying which constitutional provision should entitle Mr. Colbruno to relief.  He

alleged violations of both his Fourth Amendment right to be free of unreasonable

searches and his Fourteenth Amendment right to bodily integrity.  The district court, in

turn, accepted the Fourth Amendment rationale and did not conduct an independent

analysis of the Fourteenth Amendment claim.  But because Mr. Colbruno was neither

searched nor seized in *any* conventional sense, it is obvious—as explained above—that

any relief must stem from the Fourteenth Amendment's protections against official

misconduct; and not the Fourth Amendment's familiar assurances against unreasonable

search or seizure.

The majority understandably turns to a line of cases involving the rights of pre-trial

detainees.  Relying upon *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), and *Kingsley v.

Hendrickson*, 135 S. Ct. 2466 (2015),[3] the majority concludes "[a] detainee may not be

---

[3] Because *Kingsley* was decided after the events alleged in the complaint, *Bell* remains the applicable Supreme Court precedent.  *Kingsley* likewise addressed the state-of-mind requirement for an excessive-force claim brought under the Fourteenth Amendment.  Because the complaint does not allege excessive force, the relevance of *Kingsley*—beyond its restatement of the general principles articulated in *Bell*—is not obvious.

*punished* prior to an adjudication of guilt in accordance with due process of law." Maj. Op. 8–9. (emphasis in original) (quoting *Bell*, 441 U.S. at 535). In *Bell*, the Supreme Court explained that—when a person is confined while awaiting trial—the government must respect the presumption of his innocence. Accordingly, only those restraints against liberty that advance legitimate institutional interests will be constitutionally permissible. But "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. at 539.

The majority also points to a case not briefed by either party to apply the principles outlined in *Bell*. Relying on *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013), the majority concludes Mr. Colbruno's treatment as detailed in his complaint was tantamount to punishment. In *Blackmon*, we concluded that a juvenile detainee who claimed repeated punishment through sometimes-lengthy placement in a restraint chair had successfully alleged a violation of his due-process rights under the Fourteenth Amendment.

But a close reading of *Blackmon* offers little support for the majority's application here. The *Blackmon* panel concluded the plaintiff's allegations were so egregious that they would have cleared the more demanding hurdle of stating an Eighth Amendment violation. It therefore followed necessarily that the plaintiff had made out a violation of his substantive due process rights under the Fourteenth Amendment, since "a pretrial

-6-

detainee enjoys *at least* the same constitutional protections as a convicted criminal." *Id*. at 1241–42, 42–43. In other words, the circumstances alleged by the plaintiff proved so egregious that the test from *Bell* was beside the point.

It bears mentioning, as well, that *Blackmon* arose during a period of uncertainty surrounding the propriety of applying the shocks-the-conscience standard as the sole test for official misconduct. *See Dias v. City and Cty. Of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009) ("We held . . . that application of a 'shocks the conscience' standard in cases involving *executive* action is not to the exclusion of the foregoing ['rights'] framework."). But any residual uncertainty has since been foreclosed by *Browder v. City of Albuquerque*, 787 F.3d at 1079 n.1 (10th Cir. 2015) (Gorsuch, J.) ("[T]he "arbitrary or conscience shocking" test is the appropriate one for executive action."); *accord Dawson*, 732 F. App'x at 636 (Tymkovich, C.J., concurring) ("If a claim challenges executive action, we apply *only* the 'shocks the conscience' test.") (emphasis added).

But even if *Blackmon* represented a correct and straightforward application of *Bell*, there exist myriad factual differences between the circumstances detailed in *Blackmon* and the allegations in this case. In *Blackmon*, for instance, the plaintiff's lawsuit arose specifically from the conditions of his confinement. Here, by contrast, Mr. Colbruno never alleges his treatment arose *as a condition* of his confinement. And whereas *Blackmon* entailed repeated and systematic punishment within the confines of a detention facility, Mr. Colbruno details what would be a single constitutional violation separate and

-7-

apart from the place of his confinement.

Finally—perhaps because *Blackmon* offers so few analogous facts—the majority turns to several Fourth Amendment strip-search cases. It asserts "the conclusion [that deputies'] alleged conduct constituted a violation of the Fourteenth Amendment readily follows" from these cases. Maj. Op. 12. But violations of the Fourth Amendment are evaluated only for reasonableness. *See, e.g., Lewis*, 523 U.S. at 842–43 (noting the difference between the Fourth Amendment's "reasonableness" standard and the Fourteenth Amendment's shocks-the-conscience standard). The Fourth Amendment accordingly provides no support for a due-process claim involving official misconduct of the type alleged here.

### B. Clearly Established Violation

No matter how we analyze his claims, Mr. Colbruno has failed to allege the violation of a *clearly established* constitutional right. The Supreme Court has explained that "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *E.g., Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

Although we need not "require a case directly on point," it is nonetheless the case that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and quotation marks omitted). This is because qualified immunity is meant to "protect[] all but the plainly incompetent or those who knowingly violate the

-8-

law." *Id*. (citations and quotation marks omitted). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id*. (citations and quotation marks omitted). And the Court has likewise emphasized "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (citations and quotation marks omitted) (emphasis in original). Such an inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. (citations and quotation marks omitted) (emphasis added). The Court has also observed that—in the related Fourth Amendment context—"specificity is especially important," as "it is sometimes difficult . . . to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id*. (citations and quotation marks omitted).

The violation proposed by the majority—of a right to be free from "a restriction or condition . . . not reasonably related to a legitimate goal" Maj. Op. 14—is far too broad. While I am certainly sympathetic to the privacy interests asserted by Mr. Colbruno, no precedential case has clearly established a constitutional violation at the appropriate level of specificity under the facts alleged here.

To avoid this conclusion, the majority asserts the deputies' violation of Mr. Colbruno's rights was so obvious that we need not point to a closely aligned case. It is, of course, correct that some "constitutional violation[s] may be so obvious that similar conduct seldom arises in our cases," such that "it would be remarkable if the most

obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare attempt." *Lowe v. Raemisch*, 864 F.3d 1205, 1210-11 (10th Cir. 2017) (citations and quotation marks omitted). But this exception is exceedingly narrow, as we must effectively conclude "our precedents render the legality of the conduct undebatable." *See id*. at 1211 (citing *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016)).

In its effort to clear this hurdle, the majority again looks to *Blackmon*. But the circumstances depicted there could not credibly alert the deputies of misconduct, absent some punitive intent. Whereas punishment sat at the center of the dispute in *Blackmon*, Mr. Colbruno has not alleged facts that would suggest the deputies intended to punish him; or, for that matter, any other state of mind that would meet the constitutional standard for egregiousness. And whereas at least one official in *Blackmon* engaged in repeated, systematic, and gratuitous misconduct, Mr. Colbruno details what would be—at most—a single discrete incident that lasted only for a matter of moments.

In sum, absent plausible allegations of intentional and abusive misconduct, clearly-established law could not have alerted the deputies they were violating Mr. Colbruno's right to substantive due process. As troubling as these allegations—if true—would be, the complaint fails to tie the invasion of Mr. Colbruno's privacy to the constitutional requirement for intent.